ROBERT P. SMITH, Jr., Judge.
Scott appeals from a circuit court declaratory judgment holding that section 626.-731(2), Florida Statutes (1981), does not violate the privileges and immunities and equal protection clauses of the United States Constitution, article IV, section 2, clause 1, article XIV, section 1, nor the basic rights clause of the Florida Constitution, article I, section 2.
By vocation Scott is an insurance agent and a full-time employee of Arnica Insurance Company, which writes insurance in all 50 states. For several years, Arnica employed Scott as an underwriter at Arni-ca’s Providence, Rhode Island, office, and then at Scott’s request transferred him to its office in Coral Springs, Florida, in June or July 1981. In order to perform in Florida the sort of work he performed for Arni-ca in Rhode Island, for which Arnica deems him qualified, Scott required licensing under chapter 626 as a general lines agent. As the designation implies, a general lines agent is empowered to represent an insurer or insurers in several fields of insurance risk, rather than just one; and the distinguishing authority of such an agent, compared to specialists in a single field or restricted licensees such as solicitors or service representatives, is to “bind coverage” or effect contracts between insureds and insurers, covering any of those risks. See ch. 626, pt. I and II, Fla.Stat. (1981); Aetna Life & Casualty Co. v. Little, 384 So.2d 213 (Fla. 4th DCA 1980).
Though Scott was otherwise fully qualified for examination and licensing as a general lines agent upon his arrival in Florida — so it was agreed before the trial court —Scott’s application for licensing was denied because, as a newcomer, he did not meet the durational residency prerequisite for licensing as a general lines agent. Section 626.731(2) required that “the applicant has been a bona fide resident of this state for at least 1 year last past, and will actually reside in this state at least 6 months out of each year .... ” Though Scott and his family fully intend to remain permanent residents of Florida, the statute denied Scott a license for the one-year period of waiting in residence.
Having no license to act on his own authority, Scott continued his duties in Arni-ca’s office on a restricted basis and under supervision of another Arnica employee who held a general lines agent license. In his circuit court testimony Scott described the limitations on his work in this way:
As I understand it, and in practice what is affecting me now in my position is that I cannot bind coverage, I cannot discuss questions about insurance policies with [insureds or prospective insureds], I cannot write letters under my name in regard to insurance policies, *274 binding of coverage, binding of additional coverage.
After the circuit court entered its judgment, and while Scott’s appeal was pending, two things happened that the Department contends moot the case and require its dismissal. In June 1982 Scott completed a year’s residency in Florida and so met the durational residency requirement of section 626.731(2). And the 1982 legislature, by an act effective October 1, 1982, amended the statute to allow departmental waiver of the residency prerequisite in certain circumstances, which were in fact Scott's circumstances. Ch. 82-243, § 220, Laws of Fla.; § 626.731(l)(b), Fla.Stat. (1982 Supp.):
(b)(2) That the applicant has been a bona fide resident of this state for at least 1 year last past, except that the department, in its discretion, may waive the requirement for 1-year residence in this state if the applicant is an employee of an agency under the supervision of a currently licensed general lines agent and' will actually reside in this state at least 6 months out-of each year-
[[Image here]]
When modifying the durational residency prerequisite, it will be noted, the legislature also entirely deleted the continuing requirement that licensed general lines agents “reside in this state for at least 6 months out of each year.”
Earlier in our consideration of this case we denied the Department’s mootness motion. We adhere to that ruling now. Although Scott achieved a year’s residency in the summer of 1982, and so was entitled to licensing under the statute as it existed before the 1982 amendment, the case was then fully mature in this Court and under consideration. The constitutionality of the residency requirement remained a significant question, if not to Scott then to others. Given the difficulty of pressing constitutional litigation through the Florida judicial system within a year, to have dismissed the appeal as moot, because the durational residency requirement no longer barred Scott, would leave a persistent question, capable of repetition yet evading review. Grant v. Credithrift of America, Inc., 402 So.2d 486, 488 (Fla. 1st DCA 1981); Ocala Star Banner Corp. v. Sturgis, 388 So.2d 1367, 1369 (5th DCA 1980); see also Hicklin v. Orbeck, 565 P.2d 159, 162 (Alaska 1977), rev’d on other grounds, 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978).[1]
Nor does the 1982 amendment, effective October 1, moot Scott’s appeal. Because Scott satisfied the one-year residency requirement before the amendment became effective, the Department has had no occasion to determine whether, in the exercise of its discretion, Scott should be licensed under the terms of the statutory amendment. The constitutionality of the dura-tional residency requirement must still be determined, for that prerequisite is yet a part of the statute. It has no less force as law because the Department now has discretion, but evidently no duty, to waive the requirement for the benefit of employees of an agency “under the supervision of a currently licensed general lines agent.” Even in the case of applicants so supervised, the statutory norm is still a one-year prior Florida residency, and if that requirement is unconstitutional, the Department’s discretion to make exceptions[2] does not save the statute.
*275 We find that the 1981 statute violates the privileges and immunities clause of the United States Constitution, article IV, section 2, clause 1, which assures that “[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.” We reach no other ground of Scott’s complaint about the statute.
Florida’s durational residency prerequisite to licensing general lines insurance agents plainly discriminates against otherwise qualified nonresident insurance agents, wishing to move with their families to Florida, and recent arrivals. Longer-term Florida residents are given preferred treatment in access to a livelihood in this particular vocation; they are extended immediate admission to the examination and immediate licensing if found qualified. The Department offers a twofold justification or explanation for this discrimination: first it is said that the statute tends to assure that persons licensed as general lines agents, the most responsible and sensitive kind of agent in Florida’s licensing hierarchy, are familiar with the special characteristics of Florida’s insurance law and market practices; second, that the statute tends to assure that persons so licensed will be permanent residents, not “here to-day, gone tomorrow,” as the Department says.
The first of these stated goals, obviously, is a worthy state interest. We assume that the second is also permissible in constitutional terms, though the decisions to be discussed, invalidating straightforward residency requirements, cast some doubt on that. Accepting those stated purposes, however, the durational residency requirement nevertheless violates the privileges and immunities clause because newcomers to Florida are not convincingly shown to be a peculiar source of the problems ostensibly remedied, ignorance and transience, and more especially because the means selected to address those problems has no significant relationship either to the attributed goal of the statute or to the perceived evils addressed. Lacking the requisite close fit to the problems to be remedied, the statute has the effect of preferring old-timer Floridians to newcomers simply because of their residency histories. That is precisely what is preempted by the privileges and immunities clause of the United States Constitution.
Three decisions of the United States Supreme Court provide the standards by which state residency requirements in business licensing statutes, and durational residency prerequisites particularly, are to be analyzed for compliance with the privileges and immunities clause:
In 1948, Toomer v. Witsell[3] described the privileges and immunities clause as “designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy.”[4] “[I]t was long ago decided,” the Court stated, “that one of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State.”[5] Therefore, while disparities in treatment for which “there are perfectly valid independent reasons” are not forbidden, discrimination against citizens of other states is barred “where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States.” [6] From this it follows that significant disparities in the treatment of nonresidents, seeking business opportunities within the state on parity with residents, must be based upon “something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed,” and, beyond that, “the inquiry in each case must be ... whether such reasons do exist and whether the degree of discrimination bears a close relation to *276 them.”[7] In Toomer, South Carolina’s licensing fee for nonresident shrimpers was 100 times greater than the fee for residents, so the Court, accepting South Carolina’s stated purpose of controlling excessive trawling, judged the discrimination “so great that its practical effect is virtually exclusionary.”[8] Even assuming that nonresident shrimpers were somehow the source of excessive trawling, because of their larger boats or their greater burden upon South Carolina’s enforcement program, the Court declared that less restrictive means of regulating were available and that “a remedy so drastic as to be a near equivalent of total exclusion” was not justified.[9]
In 1978, Baldwin v. Montana Fish and Game Commission[10] refined the analysis by showing what kinds of activities within a state, by nonresidents, are not protected by the privileges and immunities clause. Elk hunting “is a recreation and a sport,” the Court said, “not a means to the nonresident’s livelihood” and therefore not “fundamental” to citizenship as are the trade and business privileges of which Justice Washington spoke in Corfield v. Coryell, 6 P.Cas. 546, 551-52 (C.C.E.D.Pa.1825) (No. 3,230). Therefore, Montana’s disparate regulation of nonresident elk hunters “simply does not fall within the purview of the Privileges and Immunities Clause.” [11]
A month later, Hicklin v. Orbeck[12] invalidated Alaska’s “across-the-board grant of a job preference to all Alaskan residents” [13] on the Trans-Alaska pipeline and in doing so emphasized two elements of the privileges and immunities analysis of prior decisions, including Toomer. The Court, again requiring that discriminatory measures be based upon a “showing ... sufficient to indicate that nonresidents were ‘a peculiar source of evil,’ ”[14] doubted that Alaska’s high unemployment was due to the influx of nonresidents, rather than to the illiteracy and geographic remoteness of the state’s residents, including its Eskimo and Indian population. But assuming that nonresidents were shown to be a peculiar source of unemployment among Alaskans, the Court said, the “across-the-board” discriminatory measure, favoring all Alaska residents (including educated citizens who had never been unemployed) over all nonresidents of Alaska, was not “closely tailored” to aid the unemployed Alaskans, and so was a prohibited discrimination against nonresidents. Thus the Court struck down Alaska Hire’s simple residency requirement, which the Alaska Supreme Court had upheld while nullifying as more obviously unconstitutional, denying equal protection of the law, the same statute’s durational residency prerequisite for favored status. Hicklin v. Orbeck, 565 P.2d 159 (Alaska 1977).
Taken together, the principles of Toomer, Baldwin and Hicklin are a formidable constitutional barrier against the discriminatory treatment of nonresidents by statutes controlling access to vocational opportunity within a state. As “[t]he right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade” is one of the “fundamental” rights of United States citizenship,[15] the privileges and immunities clause secures to nonresidents of Florida, desiring to pursue lawful occupations in Florida, the same substan *277 tial privileges and immunities that Florida extends to its own residents. Such dispensation as constitutionally exists for treating nonresidents differently, to their disadvantage, is reserved for discrete problems discretely remedied, “where the very fact of their nonresidence demonstrably creates problems for legitimate state objectives that cannot be remedied in less discriminatory ways.” Stalland v. South Dakota Board of Bar Examiners, 530 F.Supp. 155, 159 (D.S.D.1982), quoting L. Tribe, American Constitutional Law, § 6-33 at 410 (1978).
Employing those principles, recent decisions involving bar admissions[16] and public hiring have consistently invalidated state residency prerequisites of both the simple and durational types. Piper v. Supreme Court of New Hampshire, 539 F.Supp. 1064 (D.N.H.1982) (residency required at time of bar admission); Stalland, supra, (residency required at time of bar admission); Strauss v. Alabama State Bar, 520 F.Supp. 173 (N.D.Ala.1981) (three weeks prior residency before bar exam); Noll v. Alaska Bar Association, 649 P.2d 241 (Alaska 1982) (Alaska domicile required of applicants for bar admission); Sheley v. Alaska Bar Association, 620 P.2d 640 (Alaska 1980) (30 days prior residency required before bar exam); Gordon v. Committee on Character and Fitness, 48 N.Y.2d 266, 397 N.E.2d 1309, 422 N.Y.S.2d 641 (1979) (six months prior residency required of applicants for bar admission); Kuczka v. Clark, 110 Misc.2d 273, 441 N.Y. S.2d 854 (N.Y.Sup.Ct.1981) (four months prior residency required of applicants for municipal jobs), rev’d on other grounds, 86 A.D.2d 980, 448 N.Y.S.2d 325 (N.Y.App.Div.1982) (applicant above age limit; residency issue not reached).
Although the residency requirements in Toomer, Baldwin and Hicklin were of the simple not the durational sort, the principles of those decisions more surely condemn durational residency requirements than other kinds, simple or continuing. As the Alaska Supreme Court said in Sheley, refuting the Alaska Bar Association’s contention that Hicklin did not involve and therefore did not affect durational residency requirements, “[Rjather than alleviating constitutional problems, durational residency requirements exacerbate them because such requirements discriminate against short-term residents as well as nonresidents.” [17] The particularly “obnoxious” [18] *278 qualities of durational residency requirements are evident. If, as Toomer held, South Carolina may not substantially disadvantage nonresident shrimping within the state by fees greater than necessary to “compensate the State for any added enforcement burden [nonresident shrimpers] may impose or for any conservation expenditures from taxes which only residents pay,” [19] then there is even less justification for so disadvantaging residents whose only distinction is that they recently were nonresidents. And if, as Hicklin held, Alaska’s disfavoring of nonresident jobseekers offended the privileges and immunities clause because Alaska could not show they were peculiarly the cause of unemployment among Alaskan residents, then differentiating in employment eligibility between Alaskan residents of more than a year, and those of less, would be still more tenuous.
Thus understanding that Bruce Scott is not a Rhode Islander but a Floridian recently arrived from Rhode Island, we more clearly appreciate, through these equations, that the privileges and immunities secured by the Constitution are not those of nonAlaskans, or nonCarolinians, or nonFloridians, but of American citizens, whether resident or nonresident of a particular state.
By these standards the one-year dura-tional residency requirement of section 626.731(2), Florida Statutes (1981), must be held to violate the privileges and immunities clause of the United States Constitution.
We begin with the Toomer/Hicklin inquiry of whether nonresidents or, more pertinent to this case, recent arrivals to Florida constitute a peculiar source of the evil at which the statute is aimed. As stated earlier, the “evils” or problems addressed by this statute, according to the Department’s evidence and argument, are two: first, that Florida’s standards of licensing general lines insurance agents require a degree and sort of familiarity with Florida’s unique insurance market that cannot adequately be tested for by conventional examinations and, moreover, cannot be gained except by experience; and second, that transiency among general lines agents, “here today and gone tomorrow,” creates serious problems for Florida insureds holding policies that require continuing service.
Accepting at face value these perceptions of the evils or problems to be treated, or the state interests to be served by statutory regulations, there is no substantial evidence in the record tending to show that recent arrivals to Florida are, compared to Florida residents of more than a year’s standing, a peculiar source of either perceived problem. Compared with Florida residents whose only credentials are their prior residency and a wish to be admitted to the licensing examination, there is no significant evidence that recent arrivals to Florida — by which is meant persons applying for admission to the examination within a year of taking residency here — are either characteristically less experienced in Florida’s insurance “nuances,” to use a term employed by one of the witnesses, or more given to transience, than their counterparts who by virtue of longer Florida residence are admitted to the examination upon application, without further ado.
The “fit” or appropriateness of the dura-tional residency requirement to the perceived evil or problem to be remedied is more tenuous still. Surely we may credit the Department’s assertion that anyone newly exposed to a complex regulated industry will be less competent in its details than one who has had a year or more of actual experience in the field. Florida may surely differentiate between applicants having experience and those having none, when deciding who shall be licensed as general lines agents. Disparate treatment of applicants based upon experience would not offend the privileges and immunities clause, even if the regulation were to affect *279 relatively more nonresidents than residents, for the measure would bear a close relation to the problem addressed, inexperience. But what Florida may not constitutionally do is to differentiate between those who have merely passed a year here in Florida and those who have not.
The Department professes that requiring recent arrivals to choose between a year’s idleness or employment outside the insurance industry, on the one hand, and unlicensed insurance apprenticeship, on the other, encourages the latter choice and affords a prospective agent valuable experience in the Florida market. This seems a very problematic strategy; there is no evidence that this indirect coercion of new arrivals has the intended effect, except possibly with those who need it least, experienced applicants like Scott who come to Florida with prior arrangements for employment. No reason is suggested why a one-year wait induces wholly inexperienced applicants to enroll in apprenticeship programs. More pertinent for present purposes, however, the strategy entirely misses the great body of insurance greenhorns whose mere prior Florida residency is accepted in lieu of the desired apprenticeship. If experience through apprenticeship is the chosen solution for the perceived problem, Florida has shown no reason why it should be required of new residents, by indirect coercion, but not of equally inexperienced longer term residents. See La Tourette v. McMaster, 248 U.S. 465, 39 S.Ct. 160, 63 L.Ed. 362 (1919).
Nor is there a sufficient showing here that recent arrivals to Florida are, compared to residents of longer duration, peculiarly liable to leave. For two good and sufficient reasons we do not address the constitutionality of a continuing residency requirement: Scott does not contest such a requirement, as he intends to remain permanently; and there is no such requirement in this statute to contest. The 1981 statute in terms required continuing residency for only six months per year, and the 1982 amendment deleted that requirement entirely. Thus, if the problem to be addressed is one of transiency — licensed general lines agents who are here today, writing policies, and gone tomorrow, neglecting insureds — a requirement of continuing residency, for all its constitutional difficulty, would be a more precise and less restrictive measure than this one, which requires a year’s residency before licensing and none at all afterwards. Compare Noll, where the statute required residency at the time of registration for admission, but “[o]nce admitted, a member of the bar is not required to remain domiciled in Alaska.” [20]
Moreover, even if Florida residents of more than one year could be shown more stable and reliable than newcomers, “[tjhere are numerous less discriminatory means by which [the Department] can protect the state’s valid interest_” Stalland, supra, 530 F.Supp. at 160. Section 626.731(3), Florida Statutes (1981), already required any general lines agent to “maintain a place of business accessible to the public” within this state, and this requirement could be strengthened. If the Department has serious concerns about the personal stability of newcomers, it could augment the interviewing process already required under section 626.201, require more detailed character and credit reports than contemplated by section' 626.521 or demand proof of good character in the form of affidavits. Bonding also offers a less restrictive alternative. A blanket one-year durational residency requirement, however, clearly is not “closely tailored” to address the speculative evil new Floridians are alleged to pose.
Finally, we have considered and rejected the possibility of sustaining the Florida statute because it allows newcomers to work in the insurance field otherwise than as general lines agents. The discrimination practiced is a substantial one, depriving fully experienced insurance workers like Scott of authority to bind coverage, to write many kinds of insurance and to supervise other licensees. This handicap is *280 particularly onerous because it persists for a full year. A national company like Arnica rightly views this type of discrimination as a parochial trade barrier of the sort the privileges and immunities clause was designated to eliminate. Moreover, the availability of other employment in the same field or one closely related to it — for the would-be New York lawyer in Gordon, for pipeline workers in Hicklin, for shrimpers in Toomer — did not save those discriminatory statutes or even figure in those courts’ analysis. While waiting out the six-month residency requirement discussed in Gordon, for instance, the would-be New York lawyer presumably was free to work in the legal profession in some capacity under the supervision of New York attorneys. Yet the court did not even mention that possibility. We must conclude that denial of a general lines agent license is a significant burden on the usefulness of insurance employees newly transferred to this state.
The judgment of the circuit court is therefore REVERSED and section 626.-731(2), Florida Statutes (1981), is found to violate the privileges and immunities clause of the United States Constitution.
NIMMONS, J., concurs.
BOOTH, J., dissents, with opinion.

. Hicklin v. Orbeck, discussed in the text for its pertinence on the merits of this constitutional challenge, is also relevant to the mootness question. There the Alaska Supreme Court addressed the one-year residency requirement notwithstanding that during the litigation the complainants may have attained a year's residence. Characterizing the issue as "capable of repetition, yet evading review," the court decided the issue. Hicklin v. Orbeck, 565 P.2d 159, 162 (Alaska 1977), rev’d on other grounds, 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978).

. The statute as amended may be subject to criticism that it lacks constitutionally required legislative standards for exercise of the Department's discretion in regard to enforcing the du-rational residence requirement in the case of persons supervised by licensed general lines agents. See Askew v. Cross Key Waterways, 372 So.2d 913 (Fla.1978). On this subject we intimate no opinion.

. 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948).

. 334 U.S. at 395, 68 S.Ct. at 1162, 92 L.Ed. at 1471.

. 334 U.S. at 396, 68 S.Ct. at 1162, 92 L.Ed. at 1471.

. 334 U.S. at 397, 68 S.Ct. at 1162, 92 L.Ed. at 1472.

. 334 U.S. at 396, 68 S.Ct. at 1162, 92 L.Ed. at 1471.

. 334 U.S. at 396-97, 68 S.Ct. at 1162, 92 L.Ed. at 1471.

. 334 U.S. at 398, 68 S.Ct. at 1163, 92 L.Ed. at 1472.

. 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978).

. 436 U.S. at 388, 98 S.Ct. at 1862-63, 56 L.Ed.2d at 368.

. 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978).

. 437 U.S. at 528, 98 S.Ct. at 2488, 57 L.Ed.2d at 406.

. 437 U.S. at 527, 98 S.Ct. at 2488, 57 L.Ed.2d at 405.

. Corfield v. Coryell, 6 F.Cas. 546, 552 (C.C.E.D.Pa.1825) (No. 3,230).

. It is a coincidence that the decided cases had principally to do with bar admissions, or at most suggests the kind of prospective licensee who is least apt to acquiesce in groundless disfavored treatment. At any rate it is constitutionally insignificant that those invalid statutes pinched lawyers who were nonresident, or recently arrived, rather than insurance agents or workers in some other licensed class. New residents in a state are not constitutionally more privileged to be licensed as lawyers than as something else. Indeed, something opposite to that is suggested by the Department’s argument here that the insurance business is especially affected with state interests and especially susceptible to licensing regulations of this kind, disadvantaging nonresidents. We cannot accept the idea that the Constitution affords the state a wider berth in regulating general lines insurance agents than in regulating lawyers.

. 620 P.2d at 644-45, n. 26. The court also noted that durational residency requirements "create equal protection problems not generated by simple residency requirements." Similarly, the Florida Supreme Court recognized in Florida State Board of Dentistry v. Mick, 361 So.2d 414, 415 (Fla.1978), the greater presumption of constitutional invalidity that the equal protection clause attaches to durational residency requirements; such requirements must withstand strict scrutiny for "a compelling state interest,” the Court said. Though the term "fundamental” is used in reference both to rights protected by the equal protection clause and to rights protected by the privileges and immunities clause, the term apparently has a broader application under the latter. See L. Tribe, American Constitutional Law § 6-33 at 411 (1978): "If the privileges and immunities clause as currently construed does not precisely duplicate the equal protection clause of the fourteenth amendment, the major reasons are that the former does not protect aliens and corporations, and that non-residence and out-of-state citizenship have not in fact been deemed suspect classifications for equal protection purposes.”

.Strauss, supra, 520 F.Supp. at 178:
It is not just the administrative interpretation implementing a three-week residence requirement that this court deems obnoxious; the requirement of Rule IV itself that one certified to take the examination must be a bona fide resident of Alabama without respect to *278 the time period for such residence violates the privileges and immunities clause. See Hicklin v. Orbeck ......

. 334 U.S. at 399, 68 S.Ct. at 1163, 92 L.Ed. at 1473.

. 649 P.2d at 243.